EDWARD SAUNDERLIN, JR., PETITIONER-APPELLANT, v. E.I.
DUPONT COMPANY, RESPONDENT-RESPONDENT.

WILLIAM G. THOMPSON, PETITIONER-APPELLANT, v. E.I.
DUPONT COMPANY, RESPONDENT-RESPONDENT.

ALPHONSE FERMANO, PETITIONER-APPELLANT, v. E.I.
DUPONT COMPANY, RESPONDENT-RESPONDENT.

DOUGLAS L. COOPER, PETITIONER-APPELLANT, v. E.I.
DUPONT COMPANY, RESPONDENT-RESPONDENT.

Argued November 6, 1985—Decided May 19, 1986.

*James Katz* argued the cause for appellants (*Tomar, Parks, Seliger, Simonoff & Adourian,* attorneys; *Robert M. Capuano,* of counsel).

*Stephen T. Fannon* argued the cause for respondent (*Capehart & Scatchard,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

These four cases require us to interpret the Workers' Compensation Act, *N.J.S.A.* 34:15–36, which defines permanent partial disability. The questions presented are: (1) whether the statutory definition's requirement of "demonstrable objective medical evidence" applies to claims of psychiatric disability; (2) if so, what constitutes demonstrable objective medical evidence of psychiatric disability; and (3) whether there is sufficient

evidence in these cases to meet this requirement and thus to support petitioners' awards of permanent partial psychiatric disability.

## I

Petitioners, Saunderlin, Fermano, Cooper and Thompson, are employed by respondent, E.I. DuPont Co. Each filed a workers' compensation claim against DuPont, alleging physical and psychiatric disability (pulmonary asbestosis and anxiety) attributable to exposure to toxic fumes, dust chemicals, and asbestos. In all cases, respondent stipulated that petitioners during their employment had a potential for exposure to asbestos, and every petitioner has undisputed x-ray evidence of pleural thickening and asbestosis.

In the Division of Workers' Compensation, the same Judge of Compensation heard the claims of Saunderlin, Fermano, and Thompson. He awarded Saunderlin a ten-percent permanent partial physical disability for pulmonary disorder, but denied Fermano's and Thompson's parallel claims. The Judge, however, granted each petitioner an award of permanent partial psychiatric disability for anxiety reaction or cancer-phobia (the extreme fear of developing cancer in the future as a result of the past exposure). He noted this state's long history of recognizing psychiatric as distinguished from physical disability claims, and stated that requiring claims of permanent partial psychiatric disability to be based upon demonstrable objective medical evidence did not comport with his understanding of the psyche. He therefore concluded that this requirement did not apply to psychiatric disability claims of the sort that Saunderlin, Fermano, and Thompson raised. The Judge of Compensation who heard Cooper's claim reached the same conclusion through similar reasoning. Accordingly, in every case the petitioner received an award for permanent partial psychiatric disability.

DuPont appealed to the Appellate Division in all four cases. The appeals were limited solely to the question whether *N.J.*

*S.A.* 34:15–36 requires "demonstrable objective medical evidence" of permanent partial psychiatric disability. Inasmuch as the four appeals involved a common legal issue, the Appellate Division consolidated them for the purpose of disposition. Holding the requirement of "demonstrable objective medical evidence" applicable to claims for permanent partial psychiatric disability, and finding such evidence lacking in each of these cases, the Appellate Division reversed the awards to all four employees. *Saunderlin v. E.I. du Pont Co.*, 199 *N.J.Super.* 145 (App.Div.1985). We granted the employees' petitions for certification, 101 *N.J.* 299 (1985), and now affirm the judgment of the Appellate Division.

## II

The initial question is whether the statutory definition's requirement of "demonstrable objective medical evidence" applies to permanent partial *psychiatric* disability claims, just as it undoubtedly applies to permanent partial *physical* disability claims. *N.J.S.A.* 34:15–36, whose relevant provisions were enacted as part of the 1979 amendments to the Workers' Compensation Act,[1] defines permanent partial disability as follows:

"Disability permanent in quality and partial in character" means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earnings. Injuries such as minor lacerations, minor contusions, minor sprains, and scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature such as mild dermatitis and mild bronchitis shall not constitute permanent disability within the meaning of this definition.

---

[1] *N.J.S.A.* 34:15–36 includes definitions enacted as part of the 1979 amendments, *L.* 1979, *c.* 283, § 12, eff. January 10, 1980, along with other definitions adopted at different times. When we refer to *N.J.S.A.* 34:15–36, we mean only the former.

This definition neither includes nor excludes claims of psychiatric disability. The definition of permanent total disability, in contrast, mentions both sorts of impairment:

> "Disability permanent in quality and total in character" means a physical or neuropsychiatric total permanent impairment caused by a compensable accident or compensable occupational disease where no fundamental or marked improvement in such condition can be reasonably expected.

The parties disagree concerning the inferences to be drawn from the presence of "physical or neuropsychiatric" in the latter definition and its absence in the former.[2]

Neither standing alone nor taken together do the words of these definitions resolve this ambiguity. We are persuaded, however, by our review of the whole statutory scheme before and after the 1979 amendments, and of the legislative history surrounding those amendments, that the requirement of demonstrable objective medical evidence applies to permanent partial psychiatric disabilities as well as to physical disabilities.

First, we consider the definition of permanent partial disability in relation to the whole statutory scheme before and after the 1979 amendments. Under *N.J.S.A.* 34:15-7, personal injuries to employees "arising out of and in the course of employment" (with exceptions not relevant here) are compensable. Since *Sigley v. Marathon Razor Blade Co.*, 111 *N.J.L.* 25 (E. & A. 1933), New Jersey courts have recognized that these general criteria may be satisfied by either physical or psychiatric injuries to the person, and hence that psychiatric disability apart

---

[2]Petitioners argue that the absence of this distinction in the definition of permanent partial disability means that the Legislature intended that the requirement of demonstrable objective medical evidence apply only to claims of physical disability. Respondent contends that the presence of this distinction in the definition of permanent total disability shows that the Legislature recognized that permanent impairments (whether total or partial) may be either physical or psychiatric. This recognition, the argument goes, carries over implicitly to the definition of permanent partial disability—thus requiring that both psychiatric and physical disability claims be based upon demonstrable objective medical evidence.

from physical disability may be an independent compensable workers' compensation claim.

*N.J.S.A.* 34:15–12(a) to (c) sets forth a schedule of compensation for injury producing: (a) temporary disability; (b) disability total in character and permanent in quality; and (c) disability partial in character and permanent in quality. Subsection (c) encompasses both "schedule" and "non-schedule" compensation for permanent partial disability—(c)(1) to (21) establishing a schedule of compensation for enumerated physical injuries, and (c)(22) providing for compensation "[i]n all lesser or other cases" of non-scheduled disabilities.[3] Since *Sigley*, claims of psychiatric disability have been understood to be non-scheduled disabilities embraced by *N.J.S.A.* 34:15–12(c)(22).

Prior to the enactment of *N.J.S.A.* 34:15–36 as part of the 1979 amendments, there was no statutory definition of permanent partial disability. Whether scheduled or non-scheduled, *N.J.S.A.* 34:15–12(c) covered all claims of permanent partial disability, both physical and psychiatric. This Court has often reiterated the principle that "[i]n construing a statute it is to be assumed that the Legislature is thoroughly conversant with its own legislation and the judicial construction placed thereon." *Barringer v. Miele,* 6 *N.J.* 139, 144 (1951). Furthermore, "[t]he construction of a statute by the courts, supported by long acquiescence on the part of the Legislature, or by continued use of the same language, or failure to amend the statute, is evidence that such construction is in accordance with the legislative intent." *Id.* Although the Legislature did amend the statute in 1979, the language of the newly-enacted *N.J.S.A.* 34:15–36 does not explicitly eliminate claims for permanent

---

[3]N.J.S.A. 34:15–12(c)(22) reads in pertinent part:

In all lesser or other cases involving permanent loss, or where the usefulness of a member or any physical function is permanently impaired, the duration of compensation shall bear such relation to the specific periods of time stated in the above schedule as the disabilities bear to those produced by the injuries named in the schedule....

partial psychiatric disability from compensability,[4] nor does it clearly exclude such claims from the requirement of demonstrable objective medical evidence. Thus, the Legislature appears to have acquiesced in the judicial construction of *N.J.S.A.* 34:15–12(c)(22) as including claims for permanent partial psychiatric disability.

In sum, the whole statutory scheme before and after the 1979 amendments indicates that the requirements of the statutory definition of permanent partial disability in *N.J.S.A.* 34:15–36 apply to all types of permanent partial disability previously, as well as presently, encompassed by *N.J.S.A.* 34:15–12(c). Thus, claims of psychiatric disability, like those of physical disability, must be based upon demonstrable objective medical evidence.

Second, the legislative history surrounding the 1979 amendments confirms this conclusion. The 1979 amendments were "the most comprehensive reforms in the history of New Jersey's Workers' Compensation laws." Kumpf, "Occupational Disease Claims under the Workers' Compensation Reforms," 12 *Seton Hall L.Rev.* 470, 470 (1982). One of the most important changes was the adoption of the provision at issue here, the statutory definition of permanent partial disability. In *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 110–18 (1984), we extensively reviewed the legislative history leading to the enactment of this definition. A brief review of that history will shed light on its

---

[4]To be sure, the new statutory definition requires that to be compensable a disability must "restrict the function of the body or of its members or organs." But the argument that this language excludes from compensation injuries that restrict the function of the mind as distinguished from the body is weakened by two considerations. One, the statute says "restrict the function of *the body or of its members or organs*," not "restrict the function of ... [the body's] members or organs," which implies that "the body" is not merely its physical members or organs. And two, the "whole person" theory evinced in this particular definition as well as in the whole statutory scheme confirms this interpretation. *See* Lefelt, "Toward a New Method of Awarding Compensation Benefits: Solving the Permanent Partial Problem in New Jersey," 28 *Rut.L.Rev.* 587, 594 (1975); 2 A. Larson, *The Law of Workmen's Compensation,* § 57.14(e) (1983).

purpose—which was to solve the "permanent partial problem" —and therefore on its scope—which was to apply to both psychiatric and physical disability claims.

Prior to the enactment of *N.J.S.A.* 34:15–36, the courts' broad understanding of permanent partial disability under the original statute had had the practical effect that "virtually no claim was denied where the only issue was the existence or extent of disability." *Perez*, 95 *N.J.* at 112. In response to the resulting substantial increase in the cost of workers' compensation insurance, then-Governor Cahill created the New Jersey Workmen's Compensation Study Commission to evaluate the system. In its Report, the Commission observed that:

> New Jersey is paying an enormous number of relatively small awards which in the aggregate consume a very substantial proportion of workmen's compensation resources. Many of these awards are for injuries which do not actually involve permanent impairment or disability.
>
> It is obvious that steps are required to remedy this conflict and that resolution of the permanent partial problem is the most critical challenge facing the New Jersey workmen's compensation system. [*Report of the New Jersey Workmen's Compensation Study Commission* 5 (1973).]

The Report concluded that awarding compensation for so many minor injuries had taken funds from the seriously-injured workers, who were receiving grossly insufficient awards. *Id.* at 24.

To solve the "permanent partial problem," the Legislature enacted the 1979 amendments, proclaiming that they "would make available additional dollars for benefits to seriously disabled workers while eliminating, clarifying or tightening awards of compensation based upon minor permanent partial disabilities not related to the employment." Senate Labor, Industry and Professions Committee, Joint Statement to Substitutes for S. 802 and A. 840 [hereinafter Joint Statement]. Executing this purpose, *N.J.S.A.* 34:15–36 defines permanent partial disability so as to *eliminate* minor injuries and to *tighten* and to *clarify* the criteria for awards for significant impairments by requiring that they be based upon demonstrable objective medical evidence and that they either materially lessen working ability or substantially interfere with the ordi-

nary pursuits of life. *See Perez,* 95 *N.J.* at 114–18. Neither the problem nor the solution explicitly draws a distinction between physical and psychiatric disabilities. And if the scope of the problem implies the scope of the solution, the requirements of *N.J.S.A.* 34:15–36 should apply to both psychiatric and physical disability claims. By enacting the definition, the Legislature clearly intended to change the status quo of minor permanent partial disability awards. One of its major methods was to impose the requirement that the claims be based upon demonstrable objective medical evidence. To exclude psychiatric claims from this requirement would undercut the legislative intent.

In short, the "permanent partial problem" was not *psychiatric* disability claims as such, but *minor* disability claims whether physical or phychiatric. Nor was the Legislature's solution to eliminate psychiatric disability claims as distinguished from physical disability claims, or to clarify or to tighten the criteria for psychiatric claims differently than it did for physical claims. The "nuisance claims" removed by these amendments are minor disability claims, not all psychiatric disability claims significant or minor. The judgment that psychiatric disability claims epitomize the nuisance claims that the 1979 amendments were meant to eliminate is evinced neither in the language of the statutory definition nor in the legislative history of the 1979 amendments.

Accordingly, we hold that the statutory definition of permanent partial disability in *N.J.S.A.* 34:15–36 applies to claims of psychiatric disability as well as to those of physical disability, and hence that claims of both psychiatric and physical disability must be based upon "demonstrable objective medical evidence." In addition, such claims must satisfy the other criteria set forth in the statute.[5]

---

[5]Once a permanent partial disability is proven by such evidence, the court must decide whether the injury is minor or serious enough to merit compensa-

## III

Given that the requirement of demonstrable objective medical evidence applies to psychiatric as well as to physical disability claims, the next question is what constitutes demonstrable objective medical evidence of *psychiatric* as distinguished from *physical* disability. Again, the language of the statutory definition of permanent partial disability, read in isolation, does not say. But the entire statutory scheme and the legislative history establish two parameters.

First, the entire statutory scheme, which establishes that the 1979 amendments did not eliminate psychiatric as distinguished from physical disability claims, implies that objective medical evidence of psychiatric disability is not coterminous with, and therefore need not be, objective medical evidence of physical disability. Requiring physical manifestations of psychiatric disability might blur if not obliterate this distinction, practically requiring that objective medical evidence of psychiatric disability itself be objective medical evidence of physical disability. The statute does not require that psychiatrists[6] recast mental disorders into physical disorders in order for mental disorders to be compensable.

Second, the legislative history, which discloses that "objective medical evidence is understood to mean evidence exceeding the subjective statement of the petitioner," Joint Statement, *supra,* implies that the distinction between objective and subjec-

---

tion. In making this determination, *N.J.S.A.* 34:15–36 inquiries whether there has been a material lessening of an employee's working ability. If there has not been, then the inquiry turns to whether there has been a disability in the broader sense of impairment in carrying on the "ordinary pursuits of life." See *Perez v. Pantasote, Inc.,* 95 *N.J.* 105, 114–18 (1984).

[6]We do not pre-judge the question whether the statute requires that demonstrable objective medical evidence of psychiatric disability be given by psychiatrists (who are M.D.'s) as distinguished from, *e.g.,* clinical psychologists (who are Ph.D's). All of the practitioners called upon to testify in this case were psychiatrists.

tive contemplated by the Legislature is not between physical and mental (or body and mind) but between independent professional analysis and the bare statement of the patient.

These two parameters suggest that the point of requiring demonstrable objective medical evidence of psychiatric disability is not to collapse psychiatric disability into physical disability explicitly or implicitly. Rather, the requirement is to interpose a professional medical judgment between the subjective statement of the petitioner and the award of disability benefits. Presumably, evidence *exceeding* the subjective statement does not mean evidence *excluding* that statement. After all, any medical examination, whether physical or psychiatric, must begin with the subjective statement of the patient (unless he or she is unconscious). To what extent and in what manner the professional analysis must go beyond that statement in order to constitute demonstrable objective medical evidence appropriately depends upon the nature of the disability.

In most physical disability claims, medical analysis quickly goes beyond the subjective statement by the patient to clinical and laboratory tests by the physician. The medical diagnosis usually looks for, and is in terms of, observable, measurable, physical manifestations.

In psychiatric disability claims, by contrast, medical analysis to a greater degree is analysis of the subjective statement of the patient. As the Supreme Court of Washington put it, "[m]edical opinions derived from psychiatric examinations are primarily based on conversations with the patient." *Price v. Department of Labor & Indust.*, 101 *Wash.*2d 520, 682 *P.*2d 307, 311 (1984).

"Demonstrable objective medical evidence" is a legal term peculiar to the New Jersey Workers' Compensation Act,[7] not a

---

[7]No comparable statute in any other state uses this term. The Supreme Court of Washington recently has forbidden trial courts to require "objective" as opposed to "subjective" medical evidence in psychiatric disability cases.

medical term pervasive in physicians' and psychiatrists' vocabularies. Neither the *Guides to the Evaluation of Permanent Impairment* (1971) (published by the American Medical Association Committee on Rating of Mental and Physical Impairment) nor the *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980) (published by the American Psychiatric Association) [hereinafter *DSM–III*] uses such a term. Nevertheless, if the point of requiring this type of evidence is to interpose a professional medical judgment between the patient's statement and the award of benefits, then medical analogies to this legal term may suggest a helpful gloss. The closest analogy to a conception of what constitutes demonstrable objective medical evidence that the *DSM–III* offers is suggested by its lists of "diagnostic criteria" of mental disorders. These diagnostic criteria typically include not only physical manifestations observable independently of the patient's statement but also descriptions of states of mind discoverable only through that statement.[8] The former are "objective" in the sense that they

*Price v. Department of Labor & Indust.,* 101 *Wash.*2d 520, 682 *P.*2d 307, 311 (1984). But the objective-subjective distinction rejected by that Court is a physical-mental distinction that we have held is not the sense of *N.J.S.A.* 34:15–36. Hence, that opinion can be squared with ours, which views the relevant distinction as that between independent professional analysis and the bare statement of the patient.

[8]For example, the diagnostic criteria for "generalized anxiety disorder" are the following:

A. Generalized, persistent anxiety is manifested by symptoms from three of the following four categories:

(1) *motor tension:* shakiness, jitteriness, jumpiness, trembling, tension, muscle aches, fatigability, inability to relax, eyelid twitch, furrowed brow, strained face, fidgeting, restlessness, easy startle

(2) *autonomic hyperactivity:* sweating, heart pounding or racing, cold, clammy hands, dry mouth, dizziness, lightheadedness, paresthesias (tingling in hands or feet), upset stomach, hot or cold spells, frequent urination, diarrhea, discomfort in the pit of the stomach, lump in the throat, flushing, pallor, high resting pulse and respiration rate

(3) *apprehensive expectation:* anxiety, worry, fear, rumination, and anticipation of misfortune to self or others

are physical, the latter are "subjective" in the sense that they are mental; but, as established above, this is not the sense of the statute. Both types of diagnostic criteria are objective within the meaning of *N.J.S.A.* 34:15–36.

To require physical manifestations "observable" and "measurable" in psychiatric disability cases is to revert to the "if it's not physical, it's not real" mindset so incisively derided by

---

(4) *vigilance and scanning:* hyperattentiveness resulting in distractibility, difficulty in concentrating, insomnia, feeling "on edge," irritability, impatience

B.  The anxious mood has been continuous for at least one month.

C.  Not due to another mental disorder, such as Depressive Disorder or Schizophrenia.

D.  At least 18 years of age. [American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 300.02, at 233 (3d ed. 1980) [hereinafter *DSM–III*].]

And the diagnostic criteria for "post-traumatic stress disorder" are:

A.  Existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

B.  Reexperiencing of the trauma as evidenced by at least one of the following:

    (1) recurrent and intrusive recollections of the event

    (2) recurrent dreams of the event

    (3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

C.  Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:

    (1) markedly diminished interest in one or more significant activities

    (2) feeling of detachment or estrangement from others

    (3) constricted affect

D.  At least two of the following symptoms that were not present before the trauma:

    (1) hyperalertness or exaggerated startle response

    (2) sleep disturbance

    (3) guilt about surviving when others have not, or about behavior required for survival

    (4) memory impairment or trouble concentrating

    (5) avoidance of activities that arouse recollection of the traumatic event

    (6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event [*DSM–III, supra,* § 309.81, at 238.]

Professor Larson. Larson, "Mental and Nervous Injury in Workmen's Compensation," 23 *Vand.L.Rev.* 1243 (1970); 1B A. Larson, *The Law of Workmen's Compensation* §§ 42.22–.23 (1983). We rejected this mindset in *Portee v. Jaffee*, 84 *N.J.* 88, 96 (1980), and *Falzone v. Busch*, 45 *N.J.* 559, 566 (1965), overruling a long-established line of cases that had required physical impact, however slight, as a condition to recovery for emotional injuries, because of the belief that psychological injury without physical impact was a fanciful creature of "mere conjecture and speculation." We likewise reject this outlook here.[9]

We do not suggest that the *DSM–III* is a panacea for the problem of determining what constitutes demonstrable objective medical evidence of psychiatric disability. The *DSM–III* itself disclaims any such pretension.[10] Although the *DSM–III* by no means definitively resolves this problem, it at least frames it. Within this framework, we conclude that a psychiatrist's testimony as to either or both sorts of diagnostic criteria—manifestations of physical symptoms or descriptions of states of mind—might constitute demonstrable objective medical evidence as the profession of psychiatry conceives it. It therefore might suffice to interpose a professional psychiatric

---

[9]*Cf. Townsend v. Maine Bureau of Public Safety,* 404 A.2d 1014, 1016 (Me.1979) (eschewing an approach whereby courts "found talismanic the physical-mental dichotomy for purposes of [Maine's] worker's compensation law ....")

[10]Although the Academy of Psychiatry and the Law established a liaison committee with the American Psychiatric Association Task Force on Nomenclature and Statistics, which prepared the *DSM–III,* the *DSM–III* issues the following caution:

> The purpose of DSM–III is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat various mental disorders. The use of this manual for nonclinical purposes, such as determination of legal responsibility, competency or insanity, or justification for third-party payment, must be critically examined in each instance within the appropriate institutional context. [*DSM–III, supra,* at 12.]

judgment between the subjective statement of the petitioner and the award of disability benefits, as the Legislature requires. Likewise, within the two statutory parameters previously described, we conclude that a professional psychiatric judgment might rest upon: (1) analysis of the subjective statement of the patient; (2) observations of physical manifestations of the symptoms related in the subjective statement; and/or (3) observations of manifestations of physical symptoms and analyses of descriptions of states of mind beyond those related in the patient's subjective statement (*see, e.g.,* the types of evidence mentioned in the account of the clinical method, *infra* note 11). A professional psychiatric judgment derived from any or all of these bases might constitute demonstrable objective medical evidence of psychiatric disability as it is defined in the Joint Statement, for all exceed without excluding the subjective statement of the patient.

■ We cannot definitively declare in general what evidence would be sufficient to support an award for permanent partial psychiatric disability. But we can confidently state two things. One, in no event will a medical doctor's mere "parroting" of the patient's statement be sufficient. And two, if "the law must choose between having good medicine or bad medicine in its courtrooms," Diamond and Louisell, "The Psychiatrist as an Expert Witness: Some Ruminations and Speculations," 63 *Mich.L.Rev.* 1335, 1353 (1965) [hereinafter Diamond and Louisell], the Legislature (as shown by the statutory definition and legislative history) has chosen to require relatively good medicine, here relatively good psychiatry. In effectuating that choice, courts to some extent must rely upon the psychiatrist's professionalism in deploying the clinical method to insure that his or her analysis meaningfully exceeds parroting the subjective statement of the patient.[11] Beyond that, courts can resort to measures of the sort suggested by Diamond and Louisell:

---

[11]Diamond and Louisell give a useful account of the clinical method:

We suggest that in all instances the psychiatric expert be allowed to relate to the court exactly how he reached his opinion and what were the sources of his information. He should be required to describe in fairly precise terms his own process of evaluating his source material: what information did he accept, and what did he reject; what sources did he place great weight upon, and what sources did he minimize; and why did he evaluate the clinical material in these ways.

They continue:

But always, the psychiatrist (as with all physicians) must be trusted to determine in his own way what are the relevant clinical facts upon which a professional opinion can be based. For this, the psychiatrist is accountable to the standards of his professional colleagues and their accumulated body of professional skill and knowledge.

[Diamond and Louisell, *supra*, at 1354.]

Finally, they add, "He is also subject to cross-examination which may gain in incisiveness and pertinency proportionally to the freedom accorded him to tell the whole story." *Id. Cf. Price v. Department of Labor and Indust.,* 35 *Wash.App.* 139, 665 *P.*2d 434, 440 (1983), rev'd, 101 *Wash.*2d 520, 682 *P.*2d 307 (1984) (Ringold, J., dissenting) ("The dangers of self-serving statements by the injured party to a physician are properly addressed during argument and go to the weight of the physician's testimony, not its legal sufficiency.")

---

The psychiatrist is perfectly aware of the fact that the clinical history obtained from the patient is distorted and self-serving. He knows that the information provided by family and friends may have relatively little validity and that the psychological test report, or the nurses' notes, or the consultation reports of other physicians are not the whole story of the case. The psychiatrist is especially trained to assimilate information from a wide variety of sources, to evaluate each fact, to discount some, to emphasize others, and to ignore still others. He then makes his own personal observations of his patient, puts everything together, and arrives at a conclusion. This is the clinical method—the procedure by which all doctors diagnose and heal the sick. Only the quacks pretend they have X-ray eyes that can penetrate with one glance into the essence of the pathology of the body and mind.

[Diamond and Louisell, "The Psychiatrist as an Expert Witness," 63 *Mich.L. Rev.* 1335, 1353–54 (1965).]

*Cf. United States v. Sims,* 514 *F.*2d 147, 149 (9th Cir.1975) ("Years of experience teach the expert to separate the wheat from the chaff and to use only those sources and kinds of information which are of a type reasonably relied upon by similar experts in arriving at sound opinions on the subject.").

In brief, courts ultimately must rely upon the professionalism of psychiatrists, together with the checks of the trial process, to insure that awards for permanent partial psychiatric disability are based not upon mere parroting but upon demonstrable objective medical evidence of a fairly high quality. That is, courts must require relatively good psychiatry.

## IV

Finally, we apply this general conception of what constitutes demonstrable objective medical evidence of permanent partial psychiatric disability to the particular cases at hand. Our review of the records in these four cases persuades us that none of the petitioners satisfies the requirements of *N.J.S.A.* 34:15–36. To sustain awards in such cases would aggravate, not alleviate, the "permanent partial problem" that the Legislature attempted to solve through the 1979 amendments.

The relevant facts in each case are common to all four cases.[12] Each petitioner has been employed by DuPont for at least twenty years and continues to work full-time (eight hours per day, forty hours per week). All, however, testified that their working ability and ordinary pursuits of life have been impaired since they learned of their asbestos-related conditions (for example, all now avoid working overtime and pursue hobbies and household responsibilities less enthusiastically and energetically). None had ever seen a psychiatrist before his attorney referred him to one in preparation for trial. Each saw this psychiatrist only once. None has since received any medication or treatment for a psychiatric disability from that psychiatrist or any other. On the basis of this single cursory psychi-

---

[12]The Appellate Division opinion, *Saunderlin v. E.I. DuPont Co.,* 199 *N.J.Super.* 145 (App.Div.1985) sets forth other facts specific to each case.

atric examination, the psychiatrist concluded that each petitioner suffered from "generalized anxiety reaction."[13]

It appears that the psychiatric examinations in all of these cases amount to little more than parroting the subjective statements of the petitioners. And to the degree that the psychiatrist's professional analyses exceed these patients' statements, they do so only by dressing them up in the psychiatric nomenclature of "generalized anxiety reaction." This in any event is a minor mental disorder that rarely significantly impairs occupational and/or social functioning. *DSM–III, supra,* § 300.02, at 232.

Finally, even conceding *arguendo* that with their psychiatrist's testimony the petitioners have satisfied the threshold requirement of demonstrable objective medical evidence of psychiatric disability, their generalized anxiety disorders are minor, not significant injuries that materially affect working ability or substantially interfere with the ordinary pursuits of life. As a psychiatric disability, generalized anxiety disorder is thus akin to the minor physical disabilities that *N.J.S.A.* 34:15–36 specifically excludes from the meaning of permanent partial disability.

We do not wish to denigrate petitioners' claims, for we are mindful of the general rule that the Workers' Compensation Act is to be liberally construed in favor of workers. But we must remember that it is to be so construed in order to effectuate the legislative purpose. We have previously recognized that the legislative purpose in enacting *N.J.S.A.* 34:15–36 was to eliminate awards for minor permanent partial disabilities so as to increase the awards for the more seriously disabled workers. *Poswiatowski v. Standard Chlorine Chemical Co.,* 96 *N.J.* 321, 328 (1984); *Perez, supra,* 95 *N.J.* at 110–114. To award disability benefits in cases like these would flout the

---

[13]The psychiatric examinations conducted by DuPont's psychiatric experts, concluding that none of the petitioners suffered from a psychiatric disability, were no less cursory.

Legislature's attempt to solve the "permanent partial problem" through the 1979 amendments.

Since none of the petitioners in these cases has satisfied the requirements of *N.J.S.A.* 34:15–36, none is entitled to an award for permanent partial psychiatric disability. Hence, the judgment of the Appellate Division is affirmed.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.