**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0394-16T3

SAMUEL KAMENETTI,

    Petitioner-Respondent,

v.

SANGILLO & SONS, LLC,

    Respondent-Appellant.

_____

Argued December 19, 2017 — Decided August 8, 2018

Before Judges Yannotti and Leone.

On appeal from the New Jersey Department of
Labor and Workforce Development, Division of
Workers' Compensation, Claim Petition No.
2015-030953.

David P. Kendall argued the cause for
appellant (Law Office of Ann DeBellis,
attorneys; Ann DeBellis, of counsel; David P.
Kendall, on the briefs).

Robert B. White, III, argued the cause for
respondent (Garces, Grabler & LeBrocq, PC,
attorneys; Robert B. White, III, on the
brief).

Richard B. Rubenstein argued the cause for
amicus curiae New Jersey Advisory Council on
Safety and Health (Rothenberg, Rubenstein,
Berliner & Shinrod, LLC, attorneys; Richard
B. Rubenstein, on the brief).

PER CURIAM

Respondent Sangillo & Sons, LLC (Sangillo) appeals from an August 10, 2016 order of the Judge of Workers' Compensation (JWC). The JWC found petitioner Samuel Kamenetti's injuries arose out of and in the course of his employment. We reverse and remand.

I.

The following facts are taken from the JWC's August 16, 2016 oral opinion, and the testimony of Kamenetti whom the JWC credited.

Sangillo is a trucking company headquartered in Manalapan that has five trucks used for over-the-road truck driving. Kamenetti has been exclusively employed by Sangillo for over four years as an interstate truck driver carrying loads throughout the United States. The tractor-trailer he drove was owned and insured by Sangillo, and bore Sangillo's name and DOT number.

Kamenetti used Sangillo's fleet credit card to pay for fuel, and he was reimbursed for tolls. Kamenetti was paid 25% of the "load base," the fee Sangillo received for transporting the load. Sangillo's appellate Statement of Facts (SOF), which Kamenetti "accepts and adopts," states Kamenetti was not paid by the hour or the mile.

In October 2015, Kamenetti was hauling a time-sensitive load of produce from California to New Jersey. On October 8, he stopped

for the night at a small "mom and pop" truck stop in Wyoming. Such stops have parking but do not have other amenities such as showers. Kamenetti slept in the truck that night.

After waking up on October 9, Kamenetti needed a shower. He drove for an hour to a Flying J, a larger, full-service truck stop and part of the Pilot Flying J nationwide chain. It offered a free shower to commercial drivers purchasing fifty gallons of fuel. He purchased over fifty gallons of fuel, parked the truck, went into the Flying J, and took a shower. Kamenetti then dressed in the shower area. He sat on a bench to put on his boots. Unfortunately, the bench collapsed, causing him to fall and be injured, about thirty minutes after he arrived at the Flying J.

Kamenetti alerted Sangillo. He drove to a clinic several miles away where he was given pain medication. He then proceeded on the journey to drop off the cargo in New Jersey. He later accepted Pilot Flying J's settlement offer of $40,000.

Kamenetti filed a claim petition for workers' compensation. He filed a motion seeking medical treatment and temporary benefits. The JWC heard testimony from Kamenetti and Sangillo's owner Jeffrey Sangillo. On August 10, 2016, the JWC granted the motion. On August 16, the JWC issued its oral opinion finding Kamenetti's injuries "arose out of and in the course of his employment." On August 22, the JWC amended its order.

A-0394-16T3

Sangillo appeals. We permitted the New Jersey Advisory Council on Safety and Health (COSH) to appear as amicus curiae.

## II.

"Appellate review of [factual findings in] workers' compensation cases is 'limited to whether the findings made could have been reached on sufficient credible evidence present in the record . . . with due regard also to the agency's expertise[.]'" Hersh v. Cty. of Morris, 217 N.J. 236, 242 (2014) (quoting Sager v. O.A. Peterson Constr., 182 N.J. 156, 164 (2004)). Nonetheless, "the judge of compensation's legal findings are not entitled to any deference and, thus, are reviewed de novo." Id. at 243. Sangillo does not challenge the JWC's factual findings but only his legal conclusions from those findings. Thus, we must hew to our de novo standard of review.

## III.

The Workers' Compensation Act, N.J.S.A. 34:15-1 to -128, provides that "[w]hen employer and employee shall . . . accept the provisions of this article compensation for personal injuries to, or for the death of, such employee by accident arising out of and in the course of employment shall be made by the employer without regard to the negligence of the employer[.]" N.J.S.A. 34:15-7 (emphasis added). This "'broad statutory language'" led to decisions upholding "countless awards of workers' compensation

benefits." Hersh, 217 N.J. at 243 (citation omitted). It also resulted in "unjustified workers' compensation costs that [in the late 1970s were] among the highest in the nation." Jumpp v. City of Ventnor, 177 N.J. 470, 476-77 (2003) (quoting Sen. Labor, Indust. and Professions Committee, Joint Statement to Senate Comm. Substitute for S. No. 802 and Assemb. Comm. Substitute for A. No. 840, 1 (Nov. 13, 1979)) (Joint Statement).

"As a result, in 1979, the Legislature amended the Workers' Compensation Act, updating the definition of 'employment' to be more restrictive." Hersh, 217 N.J. at 244. The amendments provided "relief from the far-reaching effect of the [pre-1979] decisions by defining and limiting the scope of employment." Ibid. (quoting Joint Statement at 2). Specifically, "the Legislature for the first time defined on-premises and off-premises employment." Jumpp, 177 N.J. at 480.

> Employment shall be deemed to commence when an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of employment, excluding areas not under the control of the employer; provided, however, when the employee is required by the employer to be away from the employer's place of employment, the employee shall be deemed to be in the course of employment when the employee is engaged in the direct performance of duties assigned or directed by the employer; but the employment of employee paid travel time by an employer for time spent traveling to and from a job

A-0394-16T3

site or of any employee who utilizes an employer authorized vehicle shall commence and terminate with the time spent traveling to and from a job site or the authorized operation of a vehicle on business authorized by the employer.

[N.J.S.A. 34:15-36 (emphasis added).]

Thus, "[o]n-premises employment (as its terminology directly implies), begins when the employee gets to the place where he or she works (to the premises), and ends when the employee leaves that place; off-premises employment, however, relates to the doing of the work 'assigned or directed by the employer.'" Jumpp, 177 N.J. at 480 (quoting N.J.S.A. 34:15-36). "The employee who is 'required by the employer to be away from the employer's place of employment [is] in the course of employment,' when he or she is actually carrying out the work assignment and is therefore eligible for benefits if injured at the point." Ibid. (quoting N.J.S.A. 34:15-36).

By the new statutory language, "the Legislature sought to reduce costs by, among other things, 'sharply curtail[ing compensability for] off-premises accidents,'" including ending compensability for "'off-premises injuries sustained during lunch hour and injuries sustained while traveling at the employer's direction but deviating from a direct line of travel to pursue a purely personal activity.'" Jumpp, 177 N.J. at 477 (quoting Hon.

6

Alfred J. Napier, Impact of the Reform Act of 1980, 96 N.J. Lawyer 17, 18 (Summer 1981)) (Napier).  "In furtherance of that 'clear legislative mandate sharply curtailing compensability for off-premises accidents,'" New Jersey decisions have "recognized the legislative intent to focus on the performance of the work, thereby limiting the reach of the workers' compensation statute," and "barred recovery because the activities were personal in nature." Id. at 482 (quoting Jumpp v. City of Ventnor, 351 N.J. Super. 44, 52 (2001), aff'd, 177 N.J. 470 (2003)).

In Jumpp, our Supreme Court approved those decisions.  Id. at 480-83.  The Court "h[e]ld that when an employee is assigned to work at locations away from 'the employer's place of employment,' eligibility for workers' compensation benefits generally should be based on a finding that the employee is performing his or her prescribed job duties at the time of the injury."  177 N.J. at 482.

The Court applied that holding to bar compensation to an employee whom the city required to drive from site to site throughout a city performing his duties, using a city-owned vehicle.  Id. at 473-74.  The city "permitted [him] to make brief stops at local establishments for food and beverages or to use the restroom," and "to retrieve his personal mail from a local post office."  Id. at 474.  One day, leaving his city vehicle running,

he went to the post office to check his mail, and slipped while walking back to his city vehicle. Ibid. The Supreme Court found his injury was not compensable, because "'an employee who deviates from the temporal and spacial limits of his . . . employment tasks for the sole purpose of engaging in a personal errand or activity is simply not "engaged in the direct performance of duties"' as required by the statute." Id. at 475 (quoting Jumpp, 351 N.J. Super. at 52).

Straightforward application of the definition of off-premises "employment" in N.J.S.A. 34:15-36 and Jumpp indicates Kamenetti cannot claim workers' compensation. When he was injured, he was putting on his boots after showering. He was not "performing his . . . prescribed job duties at the time of the injury." Jumpp, 177 N.J. at 482. Thus, he was not engaged in the direct performance of duties assigned or directed by the employer," and was not "in the course of employment" when he injured himself while putting on his shoes. N.J.S.A. 34:15-36. His injury was non-compensable because "the statute provides that [off-premises employees] are to be compensated only for accidents occurring in the direct performance of their duties." Jumpp, 177 N.J. at 483.

Nonetheless, in his testimony, Kamenetti offered two rationales why "[a] shower is most important." First, "[i]t refreshes us, helps us be more alert." Second, "if I'm delivering

that afternoon or even early that morning, it's an appearance issue because not only do I represent myself as an individual, but I'm also representing the company," which could lose contracts if he was "stinking" when he made a delivery.

First, the "alertness" rationale did not support the award because there was no testimony that Kamenetti took the shower because he was getting drowsy behind the wheel. Rather, Kamenetti testified that he slept the night at the "mom and pop" truck stop, awoke, needed a shower, and drove to the Flying J to shower.

The JWC generally stated he "believe[d] that a truck driver who stops to fuel and to shower is doing so so that he can continue the safe and efficient performance of his duties." However, the JWC made no finding that Kamenetti was drowsy or otherwise unable to efficiently perform his duties without the shower, nor was there was any such testimony.

Second, the "delivering" rationale did not apply because Kamenetti was not making a delivery that day, or early the next morning. He was in Wyoming, and had several days before he had to make the delivery in New Jersey.

Given the inapplicability of those rationales, Kamenetti's showering was indistinguishable from the showering of countless on-premises employees in their homes every day before going to work. Many of those employees shower so they will be refreshed

and clean, and so they will not have body odor when they represent themselves and their company. Such employees are not "in the course of their employment" if they slip in the shower or fall while putting on their clothes or shoes. N.J.S.A. 34:15-7. Rather, they are engaged in personal hygiene and personal grooming, each a quintessentially "personal errand or activity" excluded from coverage by the statute and Jumpp. 177 N.J. at 475. Nothing in the statute indicates "off-premises employees are to be treated differently from on-premises employees." Id. at 483.

It would not be consonant with the language or intent of the 1979 amendments to extend workers' compensation to cover employees engaging in pre-work activities that will make them more refreshed, efficient, alert, fragrant, or attractive during the work day, such as bathing, eating breakfast, drinking coffee, exercising, or dressing. Treating these pre-work activities as covered would contravene the requirement that the employee "engaged in the direct performance of duties assigned or directed by the employer." N.J.S.A. 34:15-36. It would also ignore the "'clear legislative mandate sharply curtailing compensability for off-premises accidents.'" Jumpp, 177 N.J. at 482 (citation omitted).

Thus, had Kamenetti stayed in a motel or truck stop with a shower, showered there, and injured himself while dressing, he would be equally ineligible for compensation as an on-premises

10

employee who slept, showered, and dressed at home. However, he chose to stay at a "mom and pop" truck stop that had no showers, and therefore had to go elsewhere to shower. His choice does not change the result.

In Mangigian v. Franz Warner Assoc., Inc., 205 N.J. Super. 422 (App. Div. 1985), an off-premises employee was travelling through New Jersey to survey stores for her employer; after she returned to her motel and prepared reports, she walked to get food and was struck by a car. Id. at 424. Despite the obvious importance of food to sustain the employee, and its apparent unavailability at her motel, we ruled she was engaged in "a purely personal errand." Id. at 428. We opined: "the statute means exactly what it says. In order to obtain compensation for an off-premises accident, the employee must demonstrate that his injuries were sustained in the 'direct performance of [the] duties assigned [to him] or directed by the employer.'" Id. at 427 (alteration in original) (quoting N.J.S.A. 34:15-36). We held the employee "was properly denied compensation because she was not engaged in the direct performance of [assigned] duties." Id. at 423.

In Jumpp, both we and the Supreme Court relied on Mangigian. 177 N.J. at 475, 481. Even though the off-premises employee had to go out to get "supper," the Court agreed N.J.S.A. 34:15-36 "barred recovery because the activities were personal in nature

11                                                    A-0394-16T3

and concerned neither 'duties assigned nor directed,' nor 'business authorized,' by the employer." Jumpp, 177 N.J. at 481-82 (quoting Mangigian, 205 N.J. Super. at 427-28). The statute similarly bars recovery for Kamenetti's shower, even though he had to drive to get it.

In driving to get his shower, Kamenetti also drove Sangillo's truck and its cargo toward their destination, but that did not convert either his shower or his dressing afterwards into "the direct performance of duties assigned or directed by the employer." N.J.S.A. 34:15-36. Taking his morning shower remained "'a personal errand or activity.'" Jumpp, 177 N.J. at 475 (citation omitted). When he was driving the truck toward the destination, and fueling the truck, he was "performing his or her prescribed job duties," but "at the time of the injury" he had stopped performing those duties "'to pursue a purely personal activity.'" Jumpp, 177 N.J. at 477, 482 (citation omitted).

The JWC noted that "Kamenetti did not pull into the Flying J to have a drink at the bar or play recreational video games," and that any injury during those activities would have been "clearly personal to the driver, and therefore, not compensable." However, Kamenetti's morning shower was equally personal to the driver and his injury as a result was likewise not compensable.

The JWC emphasized Kamenetti chose to take his shower at the Flying J. The JWC found "[t]he very nature of the employment dictates that the facilities offered by interstate truck stops be used by interstate truckers." The JWC "believe[d] that owners of interstate trucking companies are fully aware of the degree to which both their trucks and their drivers are dependent on the frequent and efficient use of truck stops to facilitate the movement of the goods they are transporting." We do not dispute the need to fuel and service such trucks at interstate truck stops. But just as it would have been a personal activity if Kamenetti had used the bar and video games also offered by such truck stops, his use of the shower at the truck stop remained a personal activity, and not a duty "assigned or directed by the employer." N.J.S.A. 34:15-36.

The JWC ruled "Kamenetti's actions in this case were easily foreseeable and in many ways directed by Sangillo Trucking, who 'the Court finds,' directed [him] to utilize the services of the major interstate truck stops." The JWC cited Kamenetti's testimony that Sangillo wanted its trucks to be parked for the night at well-lit large truck stops with security cameras, and that Sangillo preferred he buy his fuel at a Love's truck stop if one was available, because Sangillo had a contract with Love's to receive a discount on fuel. If a Love's was not available, then Sangillo

13

wanted the truck driver to fuel at a Flying J or a few other nationwide truck stop chains.

Accepting Sangillo directed Kamenetti to park and fuel the truck at a large nationwide truck stop, Sangillo did not instruct Kamenetti where or when to shower. Kamenetti testified he made the choices when to stop for fuel "[b]ased on the truck needs or my personal needs, if I needed a shower." He agreed "when you decide to shower, when not to shower, those are your personal choices along your trip." Regarding his stop to take his morning shower at the Flying J, he admitted he was "not under orders to pull into that truck stop." There was no evidence he was directed to shower at the Flying J. See Chisholm-Cohen v. Cty. of Ocean, 231 N.J. Super. 348, 352 (App. Div. 1989) (finding an employee, encouraged by her supervisor to drive a company vehicle home to eat and change before an off-premises assignment, was not directed to do so); cf. Sager, 182 N.J. at 163-68 (finding the employer directed the employee to go get dinner and return to work).

Any argument Sangillo directed Kamenetti's choice to shower is further weakened by the fact that he was not following Sangillo's directions where to park or fuel. He chose to park for the night not at a large truck stop with cameras as Sangillo wanted, but at a "mom and pop" truck stop. He chose to fuel not at a Love's as Sangillo preferred, but at a Flying J.

The JWC also ruled that "[t]ruck driving by its very nature is a very unique endeavor. There are very few types of employment that demand an employee virtually reside in his or her place of employment, namely the truck." The JWC found compelling Kamenetti's testimony that he was responsible for the truck and the cargo from the time he left Sangillo's yard in New Jersey until he returned, including "[i]f a tire blows," "if I get into an accident," if "there is an issue with the load," and even "[i]f I get hit" when asleep while the truck was parked at the truck stop. The JWC concluded "that the injuries sustained by Mr. Kamenetti were distinctly associated with being an interstate trucker and are therefore compensable."

However, Kamenetti was not in his truck when he was injured. Nor was he dealing with a problem with the truck, such as a blown tire, an accident, a load problem, or being hit while parked for the night. He was taking his morning shower, not "performing his . . . work responsibilities at the time of the injury," as Jumpp and the statute require. 177 N.J. at 473.

Nothing in our statute suggests or permits the creation of a special rule for truck drivers that converts personal activities into work responsibilities. Our Legislature has limited compensation for all off-premises employees to injuries which occur "when the employee is engaged in the direct performance of

15                                                    A-0394-16T3

duties assigned or directed by the employer." N.J.S.A. 34:15-36. Kamenetti was required to meet that off-premises standard in order to be eligible for workers' compensation. See Zelasko v. Refrigerated Food Express, 128 N.J. 329, 339 (1992) (reversing the grant of benefits to the driver of a tractor-trailer because, "[a]lthough the employer had required that petitioner be off the premises, . . . he was in no sense engaged in the "direct performance of duties assigned or directed by the employer.").

IV.

The JWC cited cases under the "minor deviation" exception, which Kamenetti also invokes. Before 1979, the minor deviation rule was "broadly formulated." Jumpp, 177 N.J. at 479. "[D]uring that period, the Court recognized that an on-premises employee might not be 'actually working' at the time he or she was injured but that in certain circumstances compensation nonetheless should be available," such as if the employee stopped working "'to have a smoke, or to get some fresh air, or to use the telephone, or to satisfy other human needs incidental to his being at his place of employment[, or] . . . . to satisfy their interest in a passing parade or in a strange object or their curiosity generally.'" Id. at 478-79 (quoting Secor v. Penn Serv. Garage, 19 N.J. 315, 321 (1955)).

That broad rule "in effect considered personal habits or errands, such as smoking or making a phone call, to be in the 'course of employment' even though, unlike the indispensable human functions of eating and using the lavatory, employees need not engage in such activities to perform their work duties adequately." Id. at 479. It also resulted in compensation for injuries occurring during "personal activities . . . off the employer's premises, even though the injury was unconnected or only tenuously related to the employee's job duties." Ibid. (citing, e.g., Hornyak v. Great Atl. & Pac. Tea Co., 63 N.J. 99, 102 (1973) (allowing "compensation for injuries sustained during voluntary, off-premises lunch breaks")). The JWC mistakenly cited the broadly-formulated pre-1979 version of the minor deviation rule.

However, the Legislature in 1979 required the employee only "be deemed to be in the course of employment when the employee is engaged in the direct performance of duties assigned or directed by the employer." N.J.S.A. 34:15-36. "Consonant with that language, and aware of the Legislature's desire to limit the availability of benefits for off-premises injuries, our courts have since interpreted the statute to bar compensation for injuries sustained in certain activities that prior to the 1979 amendments were deemed within the scope of employment." Jumpp, 177 N.J. at 480-82 (describing Ward v. Davidowitz, 191 N.J. Super. 518 (App.

Div. 1983), Manqiqian, and Chisholm-Cohen). For example, we held that "off-premises 'lunch break accidents' are no longer compensable 'as a matter of law.'" Ibid. (quoting Ward, 191 N.J. Super. at 524).

In Jumpp, our Supreme Court described and approved those post-1979 cases, recognizing that their rationale "represents a significant departure from our pre 1979 jurisprudence wherein the minor deviation rule was applied broadly in off-premises cases." Id. at 480-83. The Court made clear that though "the minor deviation rule was [not] eliminated by the 1979 amendments," it was given a narrow new formulation to ensure coverage for off-premises employees would be no greater than the narrowed coverage for on-premises employees. Id. at 483.

The Supreme Court held: "In cases involving an alleged minor deviation, the question is . . . whether that employee has embarked on a personal errand that would have been compensable if carried out by an on-premises employee." Id. at 484.

> Off-premises employees enjoy the same ability
> to deal with certain basic needs enjoyed by
> on-premises employees such as phone calls to
> babysitters and physicians as well as coffee
> and lunch breaks. Although the line is
> difficult to draw, those minor deviations are
> different in kind from shopping excursions
> during lunch hour or a visit to a travel agent
> to plan a vacation, even when the agent works
> in the same building as the employee seeking
> benefits.

18                                                    A-0394-16T3

[Id. at 483.]

Addressing Jumpp's brief stop to check his mail while he was on the road working, the Court ruled his "'deviation was no different from the office worker who takes an afternoon break and crosses the street to pick up his personal mail at the local post office.' Neither deviation would be compensable." Id. at 484 (quoting Jumpp, 351 N.J. Super. at 52).

When Kamenetti left Sangillo's truck to go to take his morning shower at the Flying J, he was engaged during the work day in a personal errand normally occurring outside of working hours, like "shopping excursions during lunch hour." Id. at 483. Kamenetti spent approximately thirty minutes away from the truck taking his morning shower and dressing. That was not comparable to "phone calls to babysitters and physicians" - brief but necessary interruptions that do not physically remove the employee from his place of work. Ibid. It was also not comparable to "coffee and lunch breaks," which by definition are breaks for food and drink which must occur during the workday. Ibid. Rather, it was the postponed performance of a pre-work personal activity.

Under the new, narrow formulation in Jumpp, Kamenetti's showering was not a minor deviation because it "would [not] have been compensable if carried out by an on-premises employee." Id.

at 484. If an on-premises employee had started his work day without showering, and later left the work premises and gone into a nearby building to take his morning shower, any injury there would not be compensable.

Kamenetti relies on a 1936 opinion in which a hotel dishwasher finished his work and was injured after taking a shower in the hotel washroom. Taylor v. 110 S. Penna. Ave. Corp., 117 N.J.L. 346, 346 (Sup. Ct. 1936). Taylor is distinguishable because the dishwasher was "taking a shower bath on the premises of his employer," because the work "cause[d] the accumulation of dirt and perspiration" from which he was cleaning up, and because "[i]t was customary for the employees to take the shower when leaving at night and occasionally in the middle of the day, as cleanliness was essential for their work in the kitchen." Id. at 346-47.[1] Thus, the court in Taylor ruled showering on the premises was "a natural incident of the employment." Id. at 347.[2]

---

[1] Moreover, we have subsequently stated the dishwasher in Taylor was "on call" for further kitchen duties. See, e.g., Brooks v. Dee Realty Co., 72 N.J. Super. 499, 506 (App. Div. 1962).

[2] By contrast, where an on-premises employee went to a company event and returned to the work premises after his shift was over to shower, we have held "[h]is decision to return to use the employer's shower facilities was unrelated to his employment duties and served his personal interests exclusively." Mule v. N.J. Mfrs. Ins. Co., 356 N.J. Super. 389, 395-97 (App. Div. 2003).

A-0394-16T3

More fundamentally, the issue in Taylor was whether "cleaning up, including the use of the shower, could fairly be said to be an incident of the employment." Id. at 347. "[I]ncident of the employment" is the standard for the "arising out of" portion of N.J.S.A. 34:15-7's "arising out of and in the course of employment" requirements. Coleman v. Cycle Transformer Corp., 105 N.J. 285, 289-90 (1986). "[T]he 'arising out of' portion [is] construed to refer to causal origin, and the 'course of employment' portion to the time, place, and circumstances of the accident in relation to the employment." Id. at 288 (quoting 1 A. Larson, Workmen's Compensation Law, § 6.10 (1985)) (Larson). "[E]ach test must be 'independently applied and met.'" Id. at 289 (quoting 1 Larson § 6.10(a)).

Here, we need not decide whether the "arising out of" test was met, because Kamenetti failed to meet the "in the course of" requirement. As he was not "engaged in the direct performance of duties assigned or directed by the employer," N.J.S.A. 34:15-36, we need not consider whether "the risk of the occurrence was reasonably incident to the employment," Coleman, 105 N.J. at 290. Similarly, in considering Kamenetti's claim this was

> an alleged minor deviation, the question is not whether the off-premises employee was "satisfying a personal need, the completion of which is neither incidental to his . . . employment . . . nor beneficial to the

21

employer," but rather, whether that employee has embarked on a personal errand that would have been compensable if carried out by an on-premises employee.

[Jumpp, 177 N.J. at 484 (emphasis added) (quoting Jumpp, 351 N.J. Super. at 52).].

The JWC also cited Cooper v. Barnickel Enters., 411 N.J. Super. 343 (App. Div. 2010). In Cooper, when a company's plumbing foreman went to the union hall to discuss a new job with a union instructor, the instructor was busy, so the foreman took his coffee break. As there was no coffee at the union hall, he drove to get coffee elsewhere and was in an accident. Id. at 344-45. Cooper noted that "'[o]ff-premises employees enjoy the same ability to deal with certain basic needs enjoyed by on-premises employees such as . . . coffee and lunch breaks." Id. at 347 (quoting Jumpp, 177 N.J. at 483). Because the foreman "was on "his authorized 'coffee break,'" Cooper ruled that "under Jumpp, accidents occurring during coffee breaks for off-site employees, which are equivalent to those of on-site workers, are minor deviations from employment which permit recovery of workers' compensation benefits." Id. at 348. Moreover, we stated it was appropriate for the foreman to take his coffee break then because he was "facing an extended wait to consult with an expert concerning a work-related issue." Ibid.

A-0394-16T3

We find <u>Cooper</u> is inapposite.[3] Unlike Cooper, Kamenetti was not taking an authorized coffee break. Instead, he was shifting into the work day a purely personal pre-work activity, his morning shower. This was a personal errand, or activity, not a minor deviation.

V.

The amicus curiae, COSH, attempts to justify compensation under the "paid travel time," "employer-authorized vehicle," "special mission," "personal comfort," and "mutual benefit" exceptions. However, COSH acknowledges those exceptions were not argued before the JWC. New Jersey courts "do[] not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae." <u>State v. J.R.</u>, 227 N.J. 393, 421 (2017). Thus, we "decline to address these issues because they were not argued by the parties or considered by the trial court and are therefore not properly before this [c]ourt." <u>Nicholas v. Mynster</u>, 213 N.J. 463, 477 n.13 (2013).[4]

---

[3] Thus, we need not consider if <u>Cooper</u> is consistent the 1979 amendments' intent "to remove from compensability . . . off-premises injuries sustained during lunch hour." <u>Jumpp</u>, 177 N.J. at 477 (quoting <u>Napier</u> at 18); <u>see</u> <u>id.</u> at 479-80.

[4] In any event, "the Legislature laid to rest the mutual benefit doctrine" in 1979. <u>Sarzillo v. Turner Constr. Co.</u>, 101 N.J. 114, 119 (1985). Moreover, it is dubious the remaining exceptions cited by COSH apply here, given the facts and law discussed above.

We recognize the Workers' Compensation Act "'is humane social legislation.'" <u>Hersh</u>, 217 N.J. at 243 (citations omitted). Moreover, "we are mindful of the general rule that the Workers' Compensation Act is to be liberally construed in favor of workers. But we must remember that it is to be so construed in order to effectuate the legislative purpose," including "the legislative purpose in enacting N.J.S.A. 34:15-36." <u>Saunderlin v. E.I. Du Pont Co.</u>, 102 N.J. 402, 419 (1986). "'[W]e may not impute a meaning to the statutory perimeters of employment contrary to the plain language and intent of the [1979] legislation.'" <u>Chisholm-Cohen</u>, 231 N.J. Super. at 350 (citation omitted).

Kamenetti failed to meet the more restrictive standard set by the 1979 legislation. Therefore, "[t]o award disability benefits in cases like these would flout the Legislature's attempt to solve . . . through the 1979 amendments" the excessive costs caused by over-broad compensation for off-premises injuries only tenuously connected to the employee's job duties. <u>See</u> <u>Saunderlin</u>, 102 N.J. at 419-20; <u>see also</u> <u>Jumpp</u>, 177 N.J. at 476- 479.

---

<u>See also</u> <u>Zelasko</u>, 128 N.J. 336-39; <u>Scott v. Foodarama Supermarkets</u>, 398 N.J. Super. 441, 448-49 (App. Div. 2008); <u>Walsh v. Ultimate Corp.</u>, 231 N.J. Super. 383, 390-91 (App. Div. 1989). Indeed, when Kamenetti cited an unpublished Texas decision involving a special mission, the JWC remarked he did "not believe that the present case is a special mission case."

We are also aware that some other states provide coverage for traveling employee's bathing and dressing injuries. 2 Larson § 25.04 (2018). However, bathing and dressing cases had caused "[t]he greatest difficulty," and coverage has often been provided, "not on the abstract merits of covering falls by traveling employees in bath tubs, but solely on the issue of achieving consistent treatment for classes of employees." Id. at 1-2. Our Legislature and Jumpp have provided us with a clear and binding standard that avoids such difficulties and that requires off-premises employees personal activities not be covered if not covered for on-premises employees.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0394-16T3