928 A.2d 885 (2007)
395 N.J. Super. 277
Christine L. SCHORPP-REPLOGLE, Petitioner-Respondent,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 2007.
Decided July 30, 2007.
*886 Francis T. Giuliano, Ramsey, argued the cause for appellant.
Roger W. Thomas, Newton, argued the cause for respondent (Dolan and Dolan, attorneys; Mr. Thomas, of counsel; Timothy M. Brody, on the brief).
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
This appeal raises the question of whether tinnitus, often described as "ringing in the ears," may be compensable under our State's workers' compensation laws, N.J.S.A. 34:15-1 to -128, in the absence of a compensable hearing loss. We hold that tinnitus qualifies as a compensable disability under N.J.S.A. 34:15-36, provided that the condition is due in a material degree to exposure to harmful noise at the employee's workplace, materially impairs his or her working ability or is otherwise serious in extent, and is corroborated by objective medical testing despite the mainly-subjective nature of the affliction. Tinnitus meeting those requirements is compensable, even if the employee does not also have a sensorineural loss of hearing below the decibel levels specified as disabling by the Occupational Hearing Loss Act ("OHLA"), N.J.S.A. 34:15-35.10 to -35.22, contained within our workers' compensation laws.
Because petitioner's bilateral tinnitus in this case and the supporting testimony of her medical expert satisfied these standards, we affirm the $5,100 in partial total disability payments, plus fees and costs, that the Division of Compensation awarded to her after a five-day trial. We also reject respondent's separate contention that the judge of compensation was biased and deprived respondent of a fair trial.

I.
The underlying facts involve construction noise at the Parsippany office building of respondent, New Jersey Manufacturers Insurance Company ("NJM"),[1] where petitioner Christine Schorpp[2] worked for approximately six years. We summarize the facts, consistent with the findings of the judge of compensation, most pertinent to the issues on appeal.
Petitioner began working at NJM's offices in Parsippany in or about the fall of 1996 as a customer service representative. Her job entailed speaking with customers on the telephone. She worked for NJM through October 2003. As stipulated by counsel, at the relevant time she earned wages of $770 per week.
*887 At the outset of petitioner's employment, she was given a full medical examination, including a hearing test. At the time, petitioner had no known health problems and was twenty-seven years old. The record contains no indication that this physical examination revealed any hearing difficulties or other medical issues.
After completing her new employee training with NJM, petitioner was assigned a desk in the customer service area of the Parsippany office. She was never moved to any other work station at that office.
According to petitioner, who the judge specifically described in her decision as "a credible witness," construction at the Parsippany office began shortly after she started working there. Petitioner estimated that the construction continued, intermittently, for a period of thirteen to eighteen months. Initially, the construction involved workers drilling holes into cement columns for bathroom fixtures. Cables and water lines were also drilled into the ceiling of the floor directly below petitioner's desk, and anchor bolts were drilled into columns on the lower building level near her desk. Petitioner testified that the drilling, which often lasted throughout the work day, was loud enough to be heard outside the building. The workers doing the drilling were wearing hearing protection.
During the course of the loud drilling, petitioner could feel her desk vibrating and had difficulty hearing customers on the phone. She especially had trouble conversing with female callers. She had problems distinguishing between the letters "C" and "Z" and accurately hearing "VIN" (vehicle identification numbers) spoken on the phone. Petitioner stated that she had never had such hearing problems when she previously worked at a financial services company before joining NJM.
Petitioner complained about the drilling noise to her then-supervisor, Janet Gruber. She also complained to NJM's facilities manager for the building, Gary Meisch. She further recalled complaining to NJM's in-house safety committee[3] at one of its periodic meetings.
Petitioner began to notice a ringing in her ears after the initial drilling. The ringing prompted her to attend NJM's company health fair in May 1999. At the health fair she had her ears tested and was reportedly informed that she had a high frequency hearing loss. At that point, petitioner consulted with three ear, nose, and throat ("ENT") specialists, but those physicians apparently were unable to help her with the ringing problems.[4]
Subsequently, NJM decided to add a sales department at the Parsippany office by converting a space that had been a storage area filled with disassembled metal cubicles. In the course of the associated construction, the cubicles were moved out, a rug was installed, there was some drilling for electrical outlets, and a metal wall was installed between the new sales department and where petitioner sat in the customer service area. According to her testimony, petitioner's desk was situated about five feet away from this construction. Petitioner again complained about the noise caused by these activities to both her supervisor and the safety committee.
More construction at the Parsippany office commenced in 2002. The work again involved drilling into the ceiling of the room below petitioner's desk, drilling into *888 the concrete pillars near petitioner's desk, as well as some additional bathroom renovations. The workmen used masonry bits to drill into concrete reinforced by steel rebars, which were located in pillars on the floor below petitioner's desk. The insertion of such a metal bit into the steel rebar created a screeching sound. Petitioner complained about these noises in a series of e-mails to her supervisor and Meisch between March 13 and June 3, 2002.
In the spring of 2002, petitioner returned to the NJM health fair. She failed the hearing test. After this occurred, petitioner wrote directly to the President of NJM, Anthony Dickson, and informed him of her hearing loss and the noise. At that point the drilling stopped, apparently because of Dickson's intervention.
Not long thereafter, petitioner transferred to NJM's West Trenton office. She continued working there in the same position until February 2003, when she left NJM, allegedly because of ongoing construction at that office as well. She resumed working a month later for a different employer in Albany, New York.
As described in her testimony, petitioner's persisting difficulties, allegedly induced by the construction noise at NJM, included a "constant ringing in [her] ears." The ringing is most pronounced, and annoying, when there is surrounding silence. Consequently, petitioner started keeping a ticking clock nearby to mask the ringing sounds. The tinnitus interfered with petitioner's ability to work. She elaborated:
I can't hear female speakers. I hear an echo on the phone line. I can't hear the customers when they say C's and Z's, and they get frustrated with me.
Petitioner also presented expert testimony at trial from a hearing specialist, Dr. Arthur J. Matthews, D.O. Dr. Matthews is a board-certified otolaryngologist (ENT specialist), who practiced in New Jersey for thirty-two years.[5] Dr. Matthews examined petitioner on April 2, 2003, about ten months after petitioner's hearing had been tested in June 2002 by Robert Woods, M.D.
After Dr. Matthews took petitioner's medical history, his staff performed on her a hearing test known as an audiogram. The audiogram results showed that at sound frequencies between 500 to 1,000 hertz (Hz), which are the frequencies associated with regular speech, petitioner had normal hearing. However, at frequencies above 2,000 Hz, petitioner demonstrated a hearing loss, although not sufficient to exceed what Dr. Matthews recognized as the compensable level for purposes of workers' compensation. The audiogram was interpreted by Dr. Matthews as demonstrating a "high-frequency sensory neural or nerve hearing loss, both ears hearing about approximately the same." Dr. Matthews' report, which was admitted into evidence in addition to his testimony, noted that those audiogram results were similar to the results found by Dr. Woods in an earlier audiogram in June 2002.
In addition to the audiogram performed by his staff, Dr. Matthews administered a tinnitus "tone-matching test"[6] to petitioner. The doctor performed that test because petitioner had complained to him *889 about experiencing tinnitus in both ears. The tone-matching test revealed that the ringing in petitioner's ears was most closely replicated at a frequency of 4,000 Hz. Dr. Matthews found this match significant, because her audiogram had showed that her hearing loss also was most pronounced in the 4,000 Hz range. According to Dr. Matthews, these results suggested that petitioner's tinnitus was related to, or due to, her hearing loss. The 4,000 cycle, in Dr. Matthews' experience, happens to be "the cycle that's mostly or usually affected by noise exposure."
Dr. Matthews diagnosed petitioner with tinnitus, as well as a "binaural symmetrical sloping high frequency sensorineural hearing loss." He further opined that, within a reasonable degree of medical probability, petitioner's hearing loss and tinnitus were related to her exposure to noise at her workplace. He based that causal linkage on the results of his examination, as well as petitioner's history of having "absolutely no problem with hearing or tinnitus prior to the onset of that [construction] work that she described." While Dr. Matthews noted "a strong probability of noise-induced hearing loss," he recognized that the amount of that loss was not enough to qualify as a disability under the workers' compensation standards. However, Dr. Matthews did find that petitioner has "a 5% permanent partial disability due to the tinnitus. . . ."
NJM did not present testimony from a competing expert at trial. However, prior to trial, NJM procured a written report from an ENT specialist, Dr. Gerald West, D.O., dated August 17, 2004.[7] Petitioner offered the August 17 report into evidence, without objection from respondent's counsel. The report contained the following observation by Dr. West about petitioner's audiogram, which echoed the opinions of Dr. Matthews:
It is to be noted at the bottom of the hearing test that the tinnitus was matched at 4000[Hz]. Also, a neurosensory hearing loss in a young person as indicated on her audiogram is consistent with the development of tinnitus.

[Emphasis added.]
The record contains no other medical proofs.
NJM did present two of its employees as lay witnesses: Susan Armeo, a co-worker and eventual supervisor of petitioner, and Meisch, the Parsippany facilities manager. These witnesses were offered to contradict petitioner's recollections concerning the timing and other aspects of the construction work performed on the premises.
Armeo worked in the same department at NJM as petitioner when she arrived, and, in fact, trained her. In or about 2000, NJM promoted Armeo to a supervisor. In that capacity, Armeo sat in the same area as petitioner. The location was about thirty feet from petitioner. It was also about the same distance as petitioner from the bathroom, which was claimed to be often under construction.
Armeo testified that there had been some construction work in the sales department in the lower floor of the Parsippany office and also some renovations to the men's bathroom. Armeo recalled that the work had produced sounds of hammering and of drilling on concrete, but, according to her, it was "muffled." She contended that "[y]ou heard it, and at best it was annoying just to hear something else when you're trying to concentrate on your *890 work." Armeo acknowledged that, as supervisor, she received complaints from petitioner about the noise but she did not receive similar complaints from any of the thirty or more other employees in the department. Armeo indicated that she passed on petitioner's complaints to Meisch.
Meisch was initially hired by NJM as a maintenance mechanic in Parsippany in October 1996, coincidentally around the time petitioner started with the company. He was promoted to facilities manager nine months later. In his own testimony, Meisch asserted that no construction work was performed on the premises during 1999. He stated that the construction work on the bathrooms was done in 2000, and that it took only about a month-and-a-half to complete. The bathroom renovations involved the installation of cinder block walls, new toilets, a new sink, tiling, the corking of holes, and the creation of a tie-in to the sewer system. Meisch acknowledged that the corking work involved "very loud" noise, but insisted that it was done mostly on Saturdays or from 6:00 a.m. to 8:00 a.m. on weekdays before the regular hours of the customer service department. He also recalled "minor drilling" required to put anchors into the ceiling that would hold the plumbing lines. Meisch contended that no construction work was done in 2001, other than the occasional movement of employee cubicles. He stated that additional construction work "downstairs" was concluded in 2002.
Meisch recalled petitioner complaining to him about the construction noise on several occasions. He could not remember when she made all those complaints, although he acknowledged that she complained in at least 1998 and again in 2002. In response to petitioner's first complaints, Meisch recalled that he had the work crews stop drilling during work hours and instead had them "pre-drill" holes at 6:00 a.m. With respect to the subsequent work on the floors below petitioner, Meisch recalled her approaching him in May 2002 and complaining about the sound of drilling into the ceiling rebar beneath her desk. This complaint prompted Meisch to conduct a so-called "reenactment" of the noise level from the drilling, using a sound monitor. According to Meisch, the highest noise reading produced in that testing was 65 decibels, which NJM argues was acceptable and inconsequential.
After considering these proofs, the judge of compensation issued an oral decision on September 7, 2005. The judge was impressed with the candor of petitioner's testimony, in spite of respondent's efforts to discredit her recollections of the details of the workplace noise in the Parsippany office. The court accepted petitioner's version of the facts, noting the frequency of her complaints and the failure of NJM to respond effectively to them until the company's president, Dickson, intervened.[8]
With specific regard to petitioner's tinnitus, the decision notes that "the [c]ourt believed her complaints." The judge stated that
[t]he petitioner's occupation for years has been limited to telephone service work with customers. Her ears and their ability to transmit clear hearing are the most essential organs she has in this job.
Consequently, "[t]here [was] no question in the [c]ourt's mind that petitioner's disability materially affected [her] ability to work."
*891 The court also found credible the expert assessments of Dr. Matthews. The judge noted "Dr. Matthews' diagnosis and estimated disability for tinnitus are[,] in fact[,] based upon his professional training and experience of 32 years in correlating the demonstrable objective medical evidence of the audiogram with the tinnitus matching test, which if taken alone[,] is mostly subjective." The judge recognized and applied established case law in workers' compensation matters, holding that subjectively-based disabilities such as psychiatric harm may be compensable if objective medical evidence corroborates those subjective complaints. See, e.g., Saunderlin v. E.I. DuPont Co., 102 N.J. 402, 508 A.2d 1095 (1986); Perez v. Monmouth Cable Vision, 278 N.J.Super. 275, 650 A.2d 1025 (App. Div.1994), certif. denied, 140 N.J. 277, 658 A.2d 301 (1995). The judge also noted the absence of competing expert proof from the respondent.
In sum, the judge found that "[p]etitioner's tinnitus disability is significant, not minor, and of necessity must detract from the former efficiency of that part of the body, i.e. [the] ears[,] in petitioner's ordinary pursuits of life." The judge recognized, as did Dr. Matthews, that petitioner's measured amount of hearing loss failed to satisfy codified requirements for compensation. However, the judge adopted Dr. Matthews' assessment that petitioner had suffered a five percent partial total disability for her separate claim of tinnitus, which the judge concluded was causally related to petitioner's employment at NJM.
Hence, the judge awarded petitioner thirty weeks of disability benefits at $170 per week, totalling $5,100. Petitioner was also awarded incidental costs and fees, the amounts of which are not challenged on this appeal.
NJM appeals, arguing that petitioner's tinnitus is not a qualified disability in the absence of an accompanying compensable hearing loss, and that Dr. Matthews' testimony was erroneously admitted as a net opinion and, further, was not based upon sufficient objective medical evidence. NJM also maintains that the judge of compensation harbored a bias that deprived it of a fair trial. We have fully considered these contentions, the oral arguments of counsel, and the post-argument supplemental briefs filed at our invitation.

II.
The most significant issue presented in this appeal, one which we recognize will guide future cases, is the compensability of tinnitus under New Jersey's workers' compensation laws. To evaluate that issue, we first discuss the characteristics of tinnitus, and the manner in which other jurisdictions have dealt with tinnitus claims.
Tinnitus[9] has been defined as "noises in the ears." Stedman's Medical Dictionary 1838 (27th ed.2000). It is "an affliction which causes a person to experience false auditory sensations, perceiving ringing sounds when no sounds exist." Ehteshamfar v. UTA Engineered Systems, 555 N.W.2d 450, 452 (Iowa 1996). Millions of Americans are afflicted with tinnitus.[10] *892 Although tinnitus is commonly referred to as a "ringing in the ears," some persons experience it as "buzzing, humming, whistling, roaring, hissing, clicking or chirping."[11]Attorneys' Textbook of Medicine, supra, at § 84.63. Others have likened tinnitus to the sounds of crickets, ocean waves, and even music.[12]
The known potential causes of tinnitus are varied. The malady has been attributed, among other things, to noise-induced hearing loss that has damaged cilia in the inner ear, waxy build-up in the ear canal, certain medications, ear or sinus infections, jaw misalignment, cardiovascular disease, tremors, head and neck trauma, and other disorders.[13]
Several reported decisions have recognized that tinnitus may be a disability caused by traumatic events or by workplace conditions. See, e.g., Ehteshamfar v. UTA, supra, 555 N.W.2d at 453-54 (holding that tinnitus is a compensable permanent partial disability under Iowa workers' compensation laws); see also Dotolo v. FMC Corp., 375 N.W.2d 25, 27 (Minn.1985) (noting that tinnitus resulting from a work-related physical trauma is compensable); Poehlein v. Trans World Airlines, Inc., 891 S.W.2d 505, 507 (Mo.App.1994); (holding that "tinnitus, although often accompanying hearing loss, is a separate compensable injury"); General Castings Corp. v. Labor & Industry Review Comm., 152 Wis.2d 631, 449 N.W.2d 619 (App. 1989); (finding tinnitus compensable, but only where the claimant also has compensable hearing loss); Norelius v. Continental Can Co., 92 Or.App. 214, 757 P.2d 458, 459 (1988) (finding compensable an employee's claim of tinnitus from exposure to loud noise at work); Moore v. Ford Motor Co., 9 A.D.2d 165, 192 N.Y.S.2d 568, 569-71 (1959) (affirming partial disability award to a machine operator who developed tinnitus in both ears after exposure to workplace noise). A chart on this subject compiled by the United States Department of Labor reports that, as of January 1, 2003, at least nineteen states had statutes that have been interpreted to permit workers' compensation for some forms of tinnitus.[14]
*893 At the federal level, the United States Labor Appeals Board authorizes disability compensation to federal workers for tinnitus in certain situations, but only to the extent consistent with certain guidelines of the American Medical Association ("AMA"). See In Re Hauer, No. 02-689, (Empl. Comp.App. Bd. April 2, 2003); see also Cocchiarella, Linda and Gunnar Anderson ed., The American Medical Association, Guides to the Evaluation of Permanent Impairment, 246-247 (5th ed.2001) (the "AMA Guides"). In pertinent part, the AMA Guides state:
Tinnitus in the presence of unilateral or bilateral hearing impairment may impair speech discrimination. Therefore, add up to 5% for tinnitus in the presence of measurable hearing loss if the tinnitus impacts the ability to perform activities of daily living.
[Id. at 246 (emphasis added).]
Consequently, the Federal Labor Appeals Board has rejected a claim of tinnitus when the condition was not accompanied by hearing loss. In re Hauer, supra; see generally 5 U.S.C.A. § 8107(c)(22) (allowing the United States Secretary of Labor to grant compensation for the permanent loss of internal or external organs not listed on the federal compensation schedule, but only in limited circumstances).
State courts, meanwhile, are divided on whether their own state's workers' compensation laws treat workplace-induced tinnitus as a compensable disability in the absence of a compensable loss of hearing. Wisconsin, for example, has a specific statute, which prescribes that "[n]o compensation may be paid for tinnitus unless a hearing test demonstrates a compensable hearing loss other than tinnitus." See Wis. Stat. § 102.555(10) (2006). See also General Castings Corp., supra, 449 N.W.2d at 620 (applying Wisconsin's statutory restriction). On the other hand, the courts of Iowa and Missouri have held that tinnitus is a compensable claim completely independent of any proven hearing loss. Ehteshamfar v. UTA, supra, 555 N.W.2d at 453; Poehlein v. Trans World Airlines, supra, 891 S.W.2d at 507.
Our own statutes and reported cases have not squarely addressed[15] to date the compensability of tinnitus under New Jersey's workers' compensation laws. Tinnitus is not expressly listed as a scheduled compensable disability under N.J.S.A. 34:15-12(a) to -12(c). Petitioner argues, however, that workplace-induced tinnitus should be classified as an eligible disability under the general terms of N.J.S.A. 34:15-36, and compensated on a sliding scale as an otherwise-unspecified condition authorized for compensation pursuant to N.J.S.A. 34:15-12(c)(22).
The case in our state that most closely touches upon, but does not analyze, these issues is Ventre v. CPC International Inc., 285 N.J.Super. 567, 573, 667 A.2d 1083 (App.Div.1995). The petitioner in Ventre had multiple injuries, including a fractured mandible. Id. at 569, 667 A.2d 1083. Along with awarding compensation for the fracture, the judge of compensation also awarded damages "for residual effects of the TMJ syndrome, the bilateral [ear] canal fracture and the tinnitus which accompanies the injury." Ibid. (alteration in original). The judge also found a compensable hearing loss; however, the tinnitus appears to have accompanied the broken mandible, not the hearing loss. Id.
The employer in Ventre appealed, contending that the compensation judge's ruling had not been based on credible evidence and that the judge had improperly *894 "stack[ed]" the awards for each injury, instead of assessing the petitioner's disability in its totality. Id. at 573-74, 667 A.2d 1083. Agreeing that improper stacking had occurred, we remanded Ventre to the Division of Compensation for further expert testimony on the extent and nature of the petitioner's injuries and also for the judge to re-evaluate the disabilities based on the total injuries petitioner suffered. Id. at 575, 667 A.2d 1083. As to the petitioner's claim of tinnitus, we noted in passing in Ventre that "the objective basis for this finding is not apparent to us." Id. at 573, 667 A.2d 1083. However, we did not preclude such an objective foundation being supplied on remand. Nor did we categorically suggest in Ventre that tinnitus would not be compensable in the absence of a compensable hearing loss. Nevertheless, we recognize that our brief reference to tinnitus in Ventre did not clearly establish its potential compensability as a matter of law. Thus, the appeal before us is essentially one of first impression.
NJM contends that we should follow the federal administrative model and only recognize tinnitus as a basis for a disability award where an employee has also sustained a compensable hearing loss measured at decibel levels within the thresholds specified in N.J.S.A. 34:15-35.15. Because petitioner did not have such a degree of hearing loss, her tinnitus claim arguably must fail. NJM also contends that because tinnitus is inherently subjective, a tinnitus claim should only be compensated where there is demonstrable objective medical proof of the condition, which NJM contends is lacking in this case. In this regard, NJM contends that even if the "tone-matching test" performed by Dr. Matthews in this case was regarded as objective, the test reflected that petitioner's tinnitus was calibrated at the 4,000 Hz frequency, which is above the 3,000 Hz maximum compensable hearing loss specified by the OHLA and thus should not be compensable. See N.J.S.A. 34:15-35.15. The judge of compensation rejected these assertions, and so do we.
As a threshold matter, we consider whether workplace-induced tinnitus should be subjected to the specific requirements of the OHLA governing "occupational hearing loss." The Legislature enacted the OHLA, N.J.S.A. 34:15-35.10 to - 35.22, in 1979. The purpose of the statute was to standardize and to simplify worker's compensation rules for work-induced loss of hearing. See Sponsor's Statement to S.3362 (1978) (enacted as L. 1979, c. 285). The OHLA eliminated so-called "nuisance claims" for minor hearing loss, while significantly raising the amount of compensation available for more severe losses. Ibid.; Governor's Signing Statement to S.802 and S.3362 (January 10, 1980). The statute also established certain testing protocols for measuring hearing loss. See N.J.S.A. 34:15-35.16; see also Calabro v. Campbell Soup Co., 244 N.J.Super. 149, 167-68, 581 A.2d 1318 (App.Div. 1990), aff'd o.b., 126 N.J. 278, 597 A.2d 83 (1991). In a joint statement, the Senate Labor, Industry, and Professional Committee and the General Assembly Labor Committee expressed the purposes of the OHLA as follows:
The purpose of this legislation is to encourage prevention of occupational hearing impairment insofar as possible and to provide proper compensation when it does occur. It simplifies and standardizes the method of determining the percent of hearing disability and increases the amount of compensation for substantial hearing losses, minimizing or excluding compensation to those with a lesser degree of hearing impairment. It should also make hearing loss of greater concern to management and labor.

*895 [Labor, Industry & Professions Committee and Assembly Labor Committee Joint Statement to S.3362 1 (November 13, 1979) ("Joint Statement").]
The definition of "hearing loss" in the OHLA was explicitly crafted to provide compensation only for those losses of hearing caused by constant, long-term exposure to dangerous noise levels. The statute specifically excluded from its provisions any type of hearing loss or deafness caused by a sudden, brief exposure, such as an explosion. See N.J.S.A. 34:15-35.11(a). Recognizing that the ear has "excellent recuperative qualities," the Legislature limited compensation under the OHLA to those injuries arising from "day in and day out exposure" to high noise levels. Joint Statement, supra, at 1.
Moreover, the Legislature narrowly defined "occupational hearing loss" in the OHLA as "a disease that damages only the nerve of hearing in the inner ear[, not] the outer ear or the middle ear." Ibid. Sudden deafness arising out of an explosion or similar event was legislatively deemed as an "acoustic trauma," to be compensated under the general workers' compensation act provisions dealing with accidental injuries. Ibid. The Legislature also observed that compensable hearing loss under the OHLA had certain characteristics, including a gradual occurrence over a period of years and an equal or near-equal effect in both ears. Id. at 2.
In his conditional veto of the OHLA bill, Governor Byrne observed that the Legislature had "raised substantive medical questions about which there is much difference," "[b]y defining noise induced occupational hearing loss in terms of bilateral loss of hearing acuity only after a prolonged and habitual exposure." Governor's Conditional Veto Statement to S.3362, 1 (January 7, 1980). Because of that policy disagreement, the Governor required that the bill, which became the OHLA, be amended to include an opportunity for individual exceptions to this definition on a case-by-case basis, with recovery contingent upon proof that "the cause [of the hearing loss] was short term exposures to high intensity noise levels." Id. at 2.
Pursuant to the OHLA statute's rather strict terms, workers' "[c]ompensation for noise induced occupational loss of hearing which constitutes an occupational disease shall be paid only as provided [in the OHLA]." N.J.S.A. 34:15-35.10. The OHLA, in turn, defines a "[n]oise induced occupational loss" as "a permanent bilateral loss of hearing acuity of the sensorineural type due to prolonged, habitual exposure to hazardous noise in employment." N.J.S.A. 34:15-35.11(a). Further, "[s]ensorineural hearing loss" is statutorily defined as "a loss of hearing acuity due to damage to the inner ear which can result from numerous causes, as distinguished from conductive hearing loss which results from disease or injury involving the middle ear or outer ear or both and which is not caused by prolonged exposure to noise." N.J.S.A. 34:15-35.11(b).
Tinnitus clearly does not satisfy these definitions as an occupational hearing loss. Although tinnitus is often accompanied by a degree of hearing loss, it is, as the Iowa Supreme Court aptly characterized it, "a separate and distinct injury." Ehteshamfar v. UTA Engineered Systems, supra, 555 N.W.2d at 453. To some extent, tinnitus is the opposite of hearing loss, in that a person with tinnitus perceives sound, but the sound that he or she perceives is phantom. Instead of genuine sounds, the individual hears ringing, buzzing or other self-generated noises. Those noises can interfere with an individual's ability to hear true sounds created by the outside world. The sensations may be disabling in at least *896 two respects: (1) the distraction and discomfort produced by the continued sounds and (2) the inability to discern genuine sounds over the artificial ones. Ibid. (tinnitus "is not a `sensorineural loss of hearing' . . . because tinnitus does not cause a person to be unable to hear; instead tinnitus causes a person to perceive sounds that do not exist").
Even though tinnitus does not qualify as an occupational hearing loss under the OHLA, a separate question arises as to whether tinnitus may qualify as a compensable partial disability under the general terms of the workers' compensation laws. In that vein, we look to N.J.S.A. 34:15-36, which, among other things, defines a compensable "[d]isability permanent in quality and partial in character" as

a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions, nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earnings. Injuries such as minor lacerations, minor contusions, minor sprains, and scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature such as mild dermatitis and mild bronchitis shall not constitute permanent disability within the meaning of this definition.

[N.J.S.A. 34:15-36 (emphasis added).]
If tinnitus is supported by appropriate proofs meeting these criteria, we conclude that it qualifies as a permanent partial disability and is compensable, irrespective of whether the employee also suffers from an accompanying hearing loss compensable under the OHLA.
Like the OHLA, Section 34:15-36 was added to our workers' compensation laws in 1979 as part of a series of amendments to the New Jersey Workers' Compensation Act. The legislative purposes of the amendments were to "make available additional dollars for benefits to seriously disabled workers while clarifying and tightening awards of compensation benefits based upon insignificant permanent partial disabilities." Sponsor's Statement to S.3362.
Pursuant to the 1979 amendments, the compensation schedule for disabilities "partial in character and permanent in quality" is outlined at N.J.S.A. 34:15-12(c). Section 12(c)(22) supplements that schedule with a catch-all provision, stating that all otherwise unspecified permanent partial disabilities may be compensated on a sliding scale, based on the degree of the employee's disability. N.J.S.A. 34:15-12(c)(22).
A central objective the Legislature accomplished through the 1979 amendments is the elimination of minor injuries not worthy of compensation from serious workplace-induced disabilities. As the Supreme Court observed in Perez v. Pantasote, 95 N.J. 105, 114, 469 A.2d 22 (1984), "the [amended] statute's primary goals were to eliminate awards for minor partial disabilities, to increase awards for the more seriously disabled, and to contain the overall cost of workers' compensation." Toward that end, the Court in Perez interpreted the statute as incorporating a two-part test:
The first essential that must be met is a satisfactory showing of demonstrable objective medical evidence of a functional *897 restriction of the body, its members or organs. . . . [T]he next issue is determining whether the injury is minor or is serious enough to merit compensation.
[Id. at 116, 469 A.2d 22.]
As a matter of law, we are persuaded that tinnitus in some instances may be sufficiently severe and medically verifiable to warrant compensation. We also are satisfied that the record proofs here meet these dual criteria.
The first prong of the Perez test requires a "satisfactory showing" of "demonstrable objective evidence of a functional restriction of the body." Id. at 116, 469 A.2d 22. To be sure, tinnitus is largely an affliction that hinges upon the subjective perceptions of the person who senses ringing or other phantom sounds in his or her ears. See, e.g., McSween v. Michelin Tire Corp., supra, 698 So.2d at 150 (tinnitus is "basically a subjective complaint"); see also Dotolo v. FMC Corporation, supra, 375 N.W.2d at 27 (same); McGowan v. Farris, 384 So.2d 544, 545 (La.Ct.App. 1980) (same).
Nevertheless, tinnitus may have certain objective manifestations. See, e.g., Moore v. Ford Motor Co., supra, 192 N.Y.S.2d at 569-70 (accepting what was described as "scientific proof" from the claimant's treating physician that he suffered from tinnitus in both ears, which "tend[ed] to corroborate [the] claimant's description" of his sensations); Progress Quarries v. Vaandering, 80 Or.App. 160, 722 P.2d 19, 23 (1986) (noting that the "existence of the condition" of tinnitus may be verified, even though there is no objective means of determining its "progression"). At times, tinnitus may be associated with a loss of balance. See In re. Larson, 41 ECAB 947, 955 (Empl. Comp. App. Bd. 1990); In re. Potter, 39 ECAB 645, 648 (Empl. Comp. App. Bd. 1988). Additionally, tinnitus may present itself in combination with hearing loss. See, e.g., Ehteshamfar v. UTA, supra, 555 N.W.2d at 453 (quoting Attorneys' Textbook of Medicine § 84.63) (noting that "[t]innitus and hearing loss `frequently' occur together"); see also General Castings Corp., supra, 449 N.W.2d at 620 (upholding an award of benefits for bilateral tinnitus, where the claimant had a measurable hearing loss in only one ear).[16]
The unavoidable presence of subjective elements in tinnitus does not eliminate its potential compensability as an occupational disability. Other maladies with mainly subjective features, such as mental health disabilities, have been found compensable under the workers' compensation statute. For example, in Saunderlin v. E.I. DuPont Co., 102 N.J. 402, 411-16, 508 A.2d 1095 (1986), the Supreme Court held that psychiatric disability qualified as an objectively-verifiable occupational disorder, despite the fact that such a diagnosis turns, in part, on subjective statements by a patient. The Court construed the "objective medical evidence" requirement of N.J.S.A. 34:15-36 to connote proof exceeding the patient's own "bare statements" through "independent professional analysis." Id. at 412, 508 A.2d 1095. The Court in Saunderlin rejected the "if it's not physical, it's not real" approach to medical objectivity, in favor of one that enables the medical evaluator to rest his diagnosis of a psychiatric disability upon a variety of factors. Id. at 414-16, 508 A.2d 1095. Similarly, in *898 the context of orthopedic injuries, our courts have accepted the results of range-of-motion tests, even though such tests, requiring the patient to state when a movement is painful, are most often subjective. See Colon v. Coordinated Transport, Inc., 141 N.J. 1, 3, 660 A.2d 1146 (1995) (deeming range-of-motion tests relevant to workers' compensation disability assessments, even though such tests alone are not sufficient medical proof of injury).
In the present case, Dr. Matthews had an audiogram, an objective test, performed on petitioner at his office. He also administered a tone-matching test. The tone-matching test required petitioner to identify which external tones, objectively measured in hertz frequencies, most closely replicated the sounds in her head and ears. The matching process revealed that the perceived tones corresponded to 4,000 Hz. That result coincided with the fact that petitioner's hearing loss, limited as it was, also was most prominent at 4,000 Hz. According to Dr. Matthews, this confluence of data was significant, because, as he opined, the 4,000 Hz level is also the frequency "most usually affected by noise exposure."
NJM criticizes the methods of Dr. Matthews as unscientific, and attacks his conclusions as an improper "net opinion." Although we would have preferred that the doctor elaborate more upon the reasons behind his conclusions, we do not perceive that Dr. Matthews' observations were the sort of net opinions proscribed by Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). Nor do we regard them as so insufficiently scientific to qualify as inadmissible expert proof under N.J.R.E. 702; see also Creanga v. Jardal, 185 N.J. 345, 355-358, 886 A.2d 633 (2005) (reciting and applying Rule 702's criteria for admissibility).
In explaining his methodology at trial, Dr. Matthews stated that in the tone-matching test:
[Y]ou play several tones at different intensities and frequencies, and until you arrive at that one, you go up and you go down and play it louder, play it softer, and that's how you arrive at that.
The patient is then asked by the physician to identify the tones that most closely resemble the phantom noises discerned in his or her ears. This test is not entirely subjective, because the patient responding to the doctor has no idea what the diagnosis will be based upon his or her responses. The patient will not know, for example, whether or not the doctor has actually increased or decreased a frequency level before it is played. Hence, a dishonest patient trying to "fake" tinnitus would have difficulty knowing when to say during the test that his or her perceptions have changed. The consistent responses supplied by petitioner here to Dr. Matthews signal that the testing met the scientific criteria under Rule 702, and also sufficiently explained the "whys and wherefores" of the expert physician's analysis. See Beadling v. William Bowman Assoc., 355 N.J.Super. 70, 87, 809 A.2d 188 (App. Div.2002).[17] Additionally, we note that Dr. Matthews' finding of tinnitus was corroborated by the respondents' own retained expert, Dr. West.
The record also established that petitioner's tinnitus was sufficiently serious, in degree and frequency, to be compensable and was not "minor." See N.J.S.A. 34:15-36. Petitioner's testimony about the deficits in her ears, which did not previously *899 exist before she began working at NJM's Parsippany office, amply reflects that her tinnitus symptoms caused "a reduction to a material degree of [her] working ability." Perez, supra, 95 N.J. at 115, 469 A.2d 22. As the compensation judge found, the drilling sounds in petitioner's workplace caused her to have "an injury which is not minor and affects not only her working ability but her ordinary pursuits of life." Among other things, petitioner had difficulty speaking with customers over the phone. Further, the judge noted that petitioner's deficits from tinnitus were "so pervasive that if she is in a quiet room she has a clock ticking close by to lower the tinnitus effect." Given these uncontroverted facts, we have no trouble in sustaining the compensation judge's findings.
We also sustain the judge's determination that petitioner's tinnitus was caused by her exposure to noise at the Parsippany office, despite NJM's effort to show mistakes of recollection and inconsistencies in her chronological narrative. The fact-finder's determination on these matters is at least supported by substantial credible evidence, and warrants deference. Close v. Kordulak Bros., 44 N.J. 589, 598-99, 210 A.2d 753 (1965).
In holding that tinnitus may be a compensable disability under our workers' compensation laws in certain circumstances, and in finding the proofs of that work-related condition sufficient in this case, we by no means suggest that tinnitus claims shall be automatically payable just because they are asserted by an individual worker. The credibility of the worker, and of his or her medical expert, will still be subject to the rigors of cross-examination and the possibility of competing proofs. Such competing proofs may, for example, reveal flaws in the manner in which the expert tested or otherwise evaluated the petitioner's condition. Or the employer may show that the worker has behaved in a manner that would seem inconsistent with his or her claim of having persistent and painful tinnitus.
On the other hand, we do not suggest that the audiogram and tone-matching tests performed by Dr. Matthews shall be the singular accepted means for verifying tinnitus, as we anticipate the development of other medical tests that may provide even better objective indicia of the presence or absence of the condition. We simply leave the door open to future tinnitus-based claims for careful assessment by the judges of compensation, guided by their expertise in assessing the veracity, causes, and extent of disabilities in general.
Tinnitus is not an exotic or a newfangled diagnosis. Many other states have recognized its compensability. We join those states, and hold that tinnitus qualifies as a compensable disability under N.J.S.A. 34:15-36, so long as it is (1) due in a material degree to exposure to harmful workplace noise, (2) materially impairs an employee's working ability or is otherwise serious in extent, and (3) is corroborated by objective medical indicia despite the predominantly-subjective character of the affliction.[18] *900
We thus affirm the $5,100 award issued to petitioner in the Division of Compensation, and the associated fees and costs.

III.
[At the Court's direction, the published version of this opinion omits Part III, which discusses and rejects respondent's claim that the judge of compensation was biased and treated respondent unfairly. See R. 1:36-3.]
Affirmed.
NOTES
[1] Although NJM happens to be an insurance company, its sole status in this case is as an employer, not as an insurer.
[2] During the course of the litigation, petitioner's surname changed from Schorpp-Replogle to Schorpp.
[3] Petitioner eventually became a member of the safety committee.
[4] The results of the health fair testing and petitioner's consultations with the ENT specialists were not documented at trial.
[5] Dr. Matthews, who was phasing out of his full-time medical practice by the time of trial, has been qualified as an expert numerous times in the Superior Court and in the Division of Workers Compensation. Respondent, while critical of some of his opinions, did not challenge Dr. Matthews' expert credentials.
[6] The record describes the test simply as a "matching test," but we shall refer to it as a "tone-matching test" as a more descriptive label. We discuss the methodology of the tone-matching test in more detail in Part II of this opinion.
[7] The August 17, 2004 report supplemented an August 9, 2004 initial report from Dr. West, the latter of which was not moved into evidence and was not furnished to us on the appeal.
[8] The judge noted that Meisch subsequently criticized petitioner for complaining directly to Dickson, despite the fact that as president, Dickson served on the company's safety committee.
[9] The term is derived from Latin, meaning "to ring". See Webster's II New College Dictionary 1156 (1999 ed.).
[10] See, e.g., McSween v. Michelin Tire Corp., 698 So.2d 146, 149 (Ala.Civ.App.1997) (citing expert testimony that up to 35 to 50 million Americans have tinnitus); Ehteshamfar v. UTA, supra, 555 N.W.2d at 453 (citing Rosco N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine § 84.63 (3d ed.1996)) (describing tinnitus as "a very common symptom thought to be experienced by more than 37 million Americans"); American Tinnitus Association, Frequently Asked Questions About Tinnitus, at http://www.ata.org/about_tinnitus/ consumer/faq.html (last visited July 9, 2007) ("ATA Web Site") (estimating that over 50 million Americans have tinnitus to some degree, and that 12 million of those persons "have severe enough tinnitus to seek medical attention").
[11] For an example of what tinnitus sounds like to some individuals, see ATA Web Site, "About Tinnitus," at http://www.ata.org/ about__tinnitus (last visited July 9, 2007) (providing a link to a short .mp3 file).
[12] ATA Web Site, supra, at http://www.ata.org/ about__tinnitus.
[13] These possible causes are catalogued at ATA Web Site, supra, http://www.ata.org/ about__tinnitus/consumer/faq.html# 4; see also McSween v. Michelin Tire Corp., supra, 698 So.2d at 148 (noting expert testimony that tinnitus could be caused by "an ear infection, a hole in the ear drum, an accumulation of fluids in the middle ear bones, allergies, high blood pressure, a tumor, diabetes, thyroid problems, and a head or neck injury.").
[14] For a copy of the chart, see United States Department of Labor, Table 20: Occupational Hearing Loss Statutes, available at http:// www.dol.gov/esa/ regs/statutes/owcp/stwclaw/tables-html/table-20.htm (last visited July 9, 2007). The states listed as providing for tinnitus claims include Alaska, California, Florida, Hawaii, Iowa, Maine, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas and Vermont. Ibid. New Jersey is also included as a permissive state, although the chart cites to no published authority of our State to support that classification. Ibid. Six other states (Connecticut, Delaware, Maryland, Massachusetts, Mississippi and Tennessee), plus the District of Columbia, are listed as "possible" permissive jurisdictions. Ibid.
[15] We make this observation, notwithstanding the United States Department of Labor's website classification of New Jersey as a state that permits compensation for tinnitus.
[16] Technology is advancing in this area. The National Institute on Deafness and Other Communications Disorders has reported that scientists have been able to "visualize brain activity occurring with tinnitus," providing "ground-breaking information about the nature of the [affliction]." Statement of Dr. James F. Battey, Jr. to the Dep't of Health and Human Services, available at http://www. nidcd.nih.gov/abo ut/plans/congressional/openstate.asp(last visited July 9, 2007).
[17] Dr. Matthews candidly acknowledged in his testimony that his testing of petitioner had both subjective and objective aspects, and that there is no "absolutely objective" test for tinnitus.
[18] We do not read Bronico v. J.T. Baker Chemical Co., 209 N.J.Super. 220, 507 A.2d 279 (App.Div.1986), an OHLA case cited by NJM, as calling for a different result. In Bronico, the court was only "called upon to determine whether a petitioner seeking compensation for an occupational hearing loss must make a prima facie showing of exposure to hazardous noises in terms of the decibel levels set forth" in that legislation. Id. at 222, 507 A.2d 279. There is nothing in the briefs before us with respect to legislative history to suggest that the OHLA must be satisfied in order to obtain a compensable recovery for tinnitus under the separate prerequisites of N.J.S.A. 34:15-36.